### 33692.   McDILDA *v.* THE STATE.

DECIDED FEBRUARY 27, 1952.

*Milton C. Grainger, W. Reeves Lewis, T. Ross Sharpe,* for plaintiff in error.
*W. Glenn Thomas, Solicitor-General,* contra.

MacINTYRE, P. J. ■ The evidence reveals that the chronological order of the events leading to the indictment and conviction of the defendant, W. H. McDilda, for the simple larceny of a cow and calf, was as follows: John Fuller testified that he was the husband of the prosecutrix in the case, Fannie Fuller, and that they were living together as man and wife during all the times in question on this case. According to John Fuller, the defendant came to their home on a Saturday with the son of a Mr. Roberson, whom Fuller apparently knew, to see about buying the cow and calf which he is charged with stealing. The cow and calf were in the woods on that Saturday, so that the defendant could not see them and he did not make Fuller any price, nor did Fuller make any trade with him at that time, but

the defendant said that he would be back the following Monday morning at nine o'clock. The prosecutrix was at home when the defendant came there on Saturday, but she stayed in the house and did not come out to where her husband and the defendant, with the Roberson boy, were talking. After the defendant left, the prosecutrix spoke to one Isaac Ogden about penning the cow, and Fuller told his wife, the prosecutrix, that the defendant would be back for the cow and calf on Monday morning. Fannie Fuller was not at home, however, on Monday when the defendant arrived, as she was off picking cotton. Fuller testified that, after the defendant had been to their home on Saturday, he spoke to his wife about the defendant's buying the cow and calf, and she stated that it was all right to sell them to him if they would go out and find them in the woods; and he testified further that it was all right with his wife for him to sell the cow and calf, as otherwise he would not have done so as they belonged to her; that he felt like it was all right for him to sell them as he was her husband. On Monday the defendant helped Fuller to catch the cow and calf, which was a very difficult job. The first time he, Fuller, and the defendant discussed the price of the cow and calf was after the cattle had been loaded on the truck and they had returned to Fuller's house. When they got there, the defendant said that the cow and calf were worth $85, but Fuller told him that his wife would not be satisfied with that price. Fuller did not tell the defendant what he thought they were worth, as he was not sure of their value. According to Fuller, the defendant offered to unload the cattle when he told him that his wife would not be satisfied with $85, but he, Fuller, told him that he did not have any "conveniences" there for a wild cow, that he did not have any place there to put them. The defendant then asked Fuller, at the time they were discussing the price of $85, if he had change for a $100 bill, which Fuller did not; and as the defendant had $57 in change, he gave Fuller that amount and said that he, the defendant, had to go to Nahunta and would be back to see Fuller on Thursday, and he left after leaving the $57. Fuller testified that he carried the money into his house, and when his wife, the prosecutrix, came home, he told her about it and told her it was not enough money, "wasn't half enough," and his wife was not satisfied with the $57, but

that it was all right with him for the defendant to have taken the cow and calf, as otherwise he would not have gone and helped him to load them. It appeared from the evidence that the Saturday on which the defendant first came to the Fuller home was September 9, 1950, and that the Monday on which he took the cow and calf off was September 11, 1950.

The prosecutrix testified that she did not sell the cow and calf to the defendant and was not at home when he got them; that she did not tell her husband to sell the cattle to the defendant or to anybody; that her husband's health was not good and "his mind [was] not good about tending to business." She testified further that her husband gave her the $57 on the night of the day on which the defendant took the cattle off; that he handed her the money, which she counted, and her husband told her the defendant would be back on Thursday to bring more money, but she never saw him on that Thursday and did not see him until after she had (on September 23, 1950), some week and a half later, sworn out a warrant for his arrest for cheating and swindling. She also testified that she "accepted the $57 that Mr. McDilda left with my husband when he hauled my cattle off. I still have this $57." The prosecutrix testified further: "After the indictment was returned in this case in October of last year, Mr. McDilda came down to my place a number of times. He wanted me to take up the warrant. He said something about paying me about $125; that was not what I valued my cattle at; my price was $150; Mr. McDilda never did put $125 in my hands; he never did put anything; but it was the understanding if I would take up the warrant he would pay $125 for the cattle. Mr. McDilda said something about $43 that he had left with the sheriff. The sheriff told me that he had $43 for me; that would have made $100 in all; that was still short of $125 or $150. I did not accept any money and the sheriff did not give me any money. I still have the $57, however. . . John, my husband, sold the cow and calf on Monday, September 11 of last year. I was not at home that day; I was at Willie Herndon's picking cotton."

Lannis Tillman, a witness for the State, testified in part: "John Fuller is very feeble in mind and body in my opinion. I would say that he has been that way for a year. I believe that anyone

dealing with him could easily ascertain his condition." Tillman also testified that on Monday, September 11, 1950, the defendant, accompanied by a lady, came by his place of business twice with the cow and calf here in question; that the first time the defendant and the lady came by in the truck with the cow and calf, John Fuller was with them and they stopped at his, the witness's, place of business, and something was said about "going to market," and the defendant asked if he would have time to get to the Jesup stock market, to which the witness said he replied that they would if they went right on. A little later, according to Tillman, the defendant and the lady returned and stopped. This time John Fuller was not with them. The cow and calf were on the truck, just an average cattle truck; they parked again in front of his place of business, and the cow and calf could easily be seen on the truck, and there was no effort on the part of the defendant to conceal the cattle.

Other witnesses testified that there was no apparent effort on the part of the defendant to conceal his possession of the cattle or to conceal any of the details of the transaction.

M. M. Booth, a witness for the defendant, testified in part: "I had occasion to go to the home of Fannie and John Fuller in September, 1950, on a Wednesday. I know why Mr. McDilda went to their home. He said he owed a little balance on a debt to them. He said he wanted to go by there and pay them a little balance he owed them. He did not say about the amount. There was not anybody at home the day that Mr. McDilda and I went there."

The defendant in his statement to the jury said that he was taken to the Fuller home by James Roberson; he had never seen the Fullers before that time; he asked John Fuller, the prosecutrix's husband, if he could see the cows he had for sale and he replied that they were in the woods, but that he would get them up any time the defendant wanted to come back; the defendant asked Fuller if he were sure that the cattle in question were his, and he said they were and that this could be verified by a Mr. Carter, which the defendant said he did; he asked Fuller what price he wanted for them and he replied "whatever you think." The defendant said that he offered him $85, and asked if that would be enough, and Fuller said that, since the defendant had

worked hard catching them, that price would be all right; but that he did not know whether his wife would be satisfied with it or not, that the cattle belonged to him and her together, to which the defendant said that, if Fuller did not think his wife would be 'satisfied with that price, he would unload them rather than have a misunderstanding, but Fuller told him that he should not do so, as his wife had sent him to sell the cow and calf to the defendant, but that they wanted around $100 for them. The defendant, according to his statement, told Fuller to let him take them to the stock market and sell them and, if they brought enough over $100 to pay the hauling bill, then he would pay them $100. He had offered Fuller a $100 bill to take $85 out of, but he had no change, so the defendant gave him $57 in change which he had, and told him that he would be back later to pay him the balance by Thursday and that, if he did not get by there on Thursday, it would be a week or two as he was busy with his peanuts, and Fuller told him that would be all right. He went by the Fuller home on the following Wednesday, but found no one home. He made that trip in the company of Mr. Booth. The following Sunday, the defendant said, he went back to the Fuller home and took out the remainder of the money to give them, and the prosecutrix asked "How much?" and when told $85, she said, "That ain't my price." The defendant stated further that he never threatened the prosecutrix with putting her in jail, and that he took the cow and calf to Jesup and sold them the same day he hauled them off and they brought $128; that he offered to buy the defendant another cow and calf, but she refused the offer.

There is nothing in the record to indicate that John Fuller, the husband of the prosecutrix, had ever been adjudged to be mentally incompetent; but, whether or not he was mentally incompetent or competent, authorized or unauthorized by his wife to sell the cow and calf, or whether or not the defendant employed fraud, trickery, or other artifice to obtain possession of the cow and calf from the husband, it appears from the uncontradicted evidence that the husband sold the cow and calf to the defendant and delivered possession of them to him; that the defendant, upon the delivery of the possession of the cattle, paid the husband $57 as a part of the purchase price, and told him

that he would return later and pay him some additional sum as the balance of the purchase price—the evidence is not clear as to what additional sum was finally agreed upon. It also appears from the evidence without contradiction that the husband accepted the $57 and extended credit to the defendant for the balance of the purchase price, whatever it was to be; and that the prosecutrix accepted the $57 from her husband, expecting the defendant to return later with an additional sum of money to pay the balance of the purchase price, whether that balance was determined or to be determined; and that, so far as she knew, though the evidence is uncontradicted that he did, he never returned, and twelve days later, without attempting in any way to communicate with the defendant or to return the $57 to him, she swore out a warrant for his arrest for cheating and swindling; and, further, it appears that, at the time of the defendant's trial for the larceny of the cow and calf, she was still in possession of the $57, although she had seen and talked to the defendant on several occasions between the time she received the money and the time of the trial. Under this state of the evidence, it is certain that the prosecutrix, by accepting and retaining the $57, ratified her husband's action in selling the cow and calf to the defendant and in delivering possession of them to him under some agreement for the payment of the balance of the purchase price. "The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him, *or subsequently ratifies the acts of another in his behalf.*" Code, § 4-101. (Italics ours). Nor may a principal ratify the acts of an agent in part and repudiate them in part. § 4-302. While at the time the husband sold the cow and calf to the defendant and delivered possession of them to him no title to them could possibly have passed if the cows belonged to the wife and not to the husband and she had not authorized him to sell them to the defendant—the defendant did obtain title by the prosecutrix's action in accepting and retaining the $57 without attempting in any way to repudiate her husband's action by notifiying the defendant of her title or by returning the money to him. She it was who passed the title by her own acts and her own silence. "A ratification by the principal shall relate back to the act ratified, and shall take effect as if originally

authorized. A ratification may be express or *implied from the acts or silence of the principal.*" Code, § 4-303. (Italics ours). She may not simultaneously retain the fruits of her husband's unauthorized actions and repudiate the very actions which produced those fruits. *Georgia Power Co.* v. *Roper,* 201 *Ga.* 760 (41 S. E. 2d, 226). At the time of the defendant's trial for the larceny of the cow and calf, the prosecutrix still was in possession of the $57, she had not made a proper repudiation of her husband's sale, and the defendant necessarily, under those circumstances, had title to the cattle on the day he sold them, in the absence of a rescission by the prosecutrix; and though, assuming for the sake of argument that the defendant was guilty of gross moral turpitude in dealing with an obviously incompetent husband, he cannot be said to be guilty of stealing that to which he had legal title and possession. It follows that the evidence did not authorize the verdict and it was contrary to law, in consequence of which a new trial must be granted this defendant. See, in this connection, *Welch* v. *State,* 126 *Ga.* 495 (55 S. E. 183).

■ Under the view which we have taken of the case, the errors assigned in the special grounds of the motion for a new trial, as amended, are not likely to recur on another trial and are not here passed upon.

*Judgment reversed. Gardner and Townsend, JJ., concur.*